1

2              UNITED STATES DISTRICT COURT

3              SOUTHERN DISTRICT OF NEW YORK

4                 CASE NO. 14-CV-2703

5                    -   -   -

6   ESTATE OF JAMES OSCAR      :
    SMITH and HEBREW           :
7   HUSTLE, INC.,              :
          Plaintiff,           :
8        vs.                   :
    CASH MONEY RECORDS,        :
9   INC., UNIVERSAL            :
    REPUBLIC RECORDS, an       :
10  unincorporated division    :
    of UMG RECORDINGS,         :
11  INC., UNIVERSAL MUSIC      :
    GROUP DISTRIBUTION,        :
12  CORP., EMI MUSIC           :
    PUBLISHING MANAGEMENT,     :
13  LLC, UNIVERSAL             :
    MUSIC-MGB NA, LLC,         :
14  WARNER/CHAPPELL MUSIC,     :
    INC., SONY/ATV MUSIC       :
15  PUBLISHING, LLC, AUBREY    :
    DRAKE GRAHAM p/k/a         :
16  BOI-1DA, JORDAN EVANS,     :
    APPLE, INC., and AMAZON    :
17  DIGITAL SERVICES,          :
    INC.,                      :
18          Defendants.        :

19

         DEPOSITION UNDER ORAL EXAMINATION OF
20                  STEPHEN HACKER
              New York, New York
21           Thursday, May 14, 2015

22

23

24  REPORTED BY:  DANA N. SREBRENICK, CRR CLR
25  JOB NO. 93597

1

2          Transcript of the deposition of

3     STEPHEN HACKER, called for Oral

4     Examination in the above-captioned

5     matter, said deposition taken pursuant

6     to District Court Rules of Practice

7     and Procedure, by and before DANA N.

8     SREBRENICK, a Federally-Approved

9     Certified Realtime Reporter, a New

10    Jersey Certified Court Reporter, a

11    Certified Livenote Reporter, and a

12    Notary Public for the State of New

13    York, at the offices of MITCHELL

14    SILBERBERG & KNUPP LLP, 12 East 49th

15    Street, 30th Floor, New York, New

16    York, commencing at 10:00 a.m.

17

18                    -   -   -

19

20

21

22

23

24

25

Page 3

1

2      APPEARANCES:

3

4            ANTHONY MOTTA, ESQ.

5            50 Broadway

6            New York, New York 10004

7            Counsel for the Plaintiff

8

9

10

11

12

13

14            MITCHELL SILBERBERG & KNUPP

15            BY:  CHRISTINE LEPERA, ESQ.

16            12 East 49th Street

17            New York, New York 10017

18            Counsel for the Defendants

19            EMI Music, Warner/Chappell

20            Sony/ATV, Aubrey Drake Graham

21            Matthew Jehu Samuels, Jordan

22            Evans, Apple, Inc., Amazon

23            Digital Services

24

25

1

2     APPEARANCES:    (Continued.)

3

4          SHAPIRO, ARATO & ISSERLES

5          BY:  CYNTHIA ARATO, ESQ.

6          500 Fifth Avenue

7          New York, New York 10110

8          Counsel for the Defendant

9          Cash Money Records, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          -   -   -

3                      I N D E X

4                          -   -   -

5

6    Testimony of:

7       STEPHEN HACKER

8    BY MS. LEPERA.........................12

9    BY MS. ARATO.........................226

10   BY MR. MOTTO.........................232

11   BY MS. LEPERA.........................243

12

13                          -   -   -

14                   E X H I B I T S

15                          -   -   -

16   HACKER

17   NO.        DESCRIPTION              PAGE

18   Exhibit 1   Notice of Rule 30(b)(6)

19               deposition.............. 26

20   Exhibit 2   Complaint............... 27

21   Exhibit 3   Document Bates-numbered

22               0005 through 0011........ 40

23   Exhibit 4   Document Bates 0149

24               through 0164............ 63

25

1

2                                  -   -   -

3              E X H I B I T S  (Continued.)

4                                  -   -   -

5        HACKER

6        NO.          DESCRIPTION              PAGE

7        Exhibit 5     Jimmy Smith album cover

8                      and record.............. 85

9        Exhibit 6     Seven-page document of

10                     photos................. 91

11       Exhibit 7     Document Bates-numbered

12                     0044 through 0046........105

13       Exhibit 8     Document entitled

14                     Public Catalog..........118

15       Exhibit 9     Document entitled

16                     Public Catalog:  "The

17                     World in My Hands

18                     Instrumental"...........123

19       Exhibit 10    Document entitled

20                     Public Catalog: "Rich

21                     Forever"................124

22       Exhibit 11    Document Bates-numbered

23                     000972 through 000977....134

24

25

1

2                              -   -   -

3             E X H I B I T S (Continued.)

4                          -   -   -

5   HACKER

6   NO.            DESCRIPTION                PAGE

7   Exhibit 12    E-mail dated May 14,

8                 2015, with attachment....145

9   Exhibit 13    Document Bates-numbered

10                0001 through 0002........148

11  Exhibit 14    Document Bates-numbered

12                0031 through 0034........151

13  Exhibit 15    Document Bates-numbered

14                0035 through 0041........156

15  Exhibit 16    Two-page interview

16                document.................165

17  Exhibit 17    Document entitled ASCAP

18                Search...................165

19  Exhibit 18    Document entitled ASCAP

20                Search...................165

21  Exhibit 19    Document Bates-numbered

22                0012 through 0013........179

23

24

25

Page 8

1

2              E X H I B I T S  (Continued.)

3                      -   -   -

4    HACKER

5    NO.          DESCRIPTION                PAGE

6    Exhibit 20   Document entitled

7                 Public Catalog:  "Jimmy

8                 Smith Rap" by James

9                 Oscar Smith..............179

10   Exhibit 21   Document Bates-numbered

11                0053 and 0054............184

12   Exhibit 22   Document Bates-numbered

13                0047 through 0050........190

14   Exhibit 23   Document Bates-numbered

15                0014 and 0015............196

16   Exhibit 24   Document Bates-numbered

17                0120 through 0121........198

18   Exhibit 25   Document entitled First

19                Set of Requests to

20                Estate of James Oscar

21                Smith For the

22                Production of Documents

23                Electronically Stored

24                Information and

25                Tangible Things..........200

Page 9

1

2

3                          -   -   -

4              E X H I B I T S (Continued.)

5                          -   -   -

6     HACKER

7     NO.        DESCRIPTION                    PAGE

8       Exhibit 26    Document entitled About

9                     Hebrew Hustle............204

10      Exhibit 27    Two-page Twitter

11                    document.................205

12      Exhibit 28    Document Bates-numbered

13                    0114 through 0117........222

14      Exhibit 29    E-mail dated May 13,

15                    2015, with attached

16                    document Bates-numbered

17                    001034 through 001066....223

18

19

20

21

22

23

24

25

Page 10

1

2                              -   -   -

3                    DEPOSITION SUPPORT INDEX

4                              -   -   -

5

6    Directions to Witness Not to Answer

7    Page    Line

8     208      15

9

10   Request for Production of Documents

11   Page    Line

12      33     254

13      35      13

14      87      24

15     153      16

16     157      16

17     159       7

18     165      22

19     178       9

20     189      22

21     208       5

22

23

24

25

1          S. Hacker

2          THE VIDEOGRAPHER:   This is the

3    start of disk labeled No. 1 in the

4    videotaped deposition of Stephen

5    Hacker in the matter of The Estate of

6    James Oscar Smith and Hebrew Hustle,

7    Inc., v. Cash Money Records, Inc., et

8    al.

9          Today is May 14, 2015.   The time

10   is approximately 10:15 a.m.

11         Appearances will be noted on the

12   stenographic record.

13         Will the court reporter please

14   swear in the witness.

15         (Whereupon, the witness is sworn

16   in.)

17         MS. LEPERA:   Christine Lepera,

18   counsel for certain of the defendants

19   in the case of Estate of James Oscar

20   Smith and Hebrew Hustle versus Cash

21   Money Records, specifically Defendants

22   BMI Music Publishing Management;

23   Warner/Chappell Music, Inc.; Sony/ATV

24   Music Publishing, LLC; Aubrey Drake

25   Graham, professionally known as Drake;

1              S. Hacker

2     and Amazon Digital Services, Inc.

3         MS. ARATO:  Cynthia Arato,

4     representing Cash Money Records and

5     the UMG entities.

6         MR. MOTTO:  Anthony Motto for

7     plaintiffs.

8         STEPHEN HACKER, residing at 7759

9     Tennyson Court, Boca Raton, Florida

10    33433, having first been duly sworn by

11    the Notary Public of the State of

12    New York, was examined and testified

13    as follows:

14               -   -   -

15        DIRECT EXAMINATION BY MS. LEPERA:

16               -   -   -

17    Q.    Good morning, Mr. Hacker.

18    A.    Good morning.

19    Q.    Okay.  Have you ever been

20 deposed before?

21    A.    No.

22    Q.    Okay.  So let me give you some

23 basic guidelines.  I am sure your counsel

24 has already given them to you, but I will

25 give you some of these guidelines so that

1                   S. Hacker

2        A.     No.

3        Q.     Okay.  So when you say you

4   connected songwriters to artists, were

5   these songwriters persons that you were

6   managing?

7        A.     Yes.

8        Q.     Did you connect any songwriters

9   that you were not managing --

10       A.     Yes.

11       Q.     -- to artists?

12              Okay.  And with respect to the

13   work that you say you did with them in

14   connection with a studio -- strike that.

15              Okay.  So, coming to 2011, you

16   decided to form Hebrew Hustle, Inc., to

17   formalize a music publishing business; is

18   that -- is that fair to say?

19       A.     Yes, and a -- yes.

20       Q.     And a production company?

21       A.     Yes.

22       Q.     Okay.  And is there any

23   distinction in your mind between those two

24   roles?

25       A.     Yes.

S. Hacker

1  of Matthew Del Giorno.  He's written songs

2  for Cash Money Records artist Little

3  Wayne.

4       I have another songwriter by the

5  name of Roger Dickerson, who's also

6  written songs that I licensed to Cash

7  Money Records.

8       And several others.

9       Q.    Okay.  Now, in connection with

10 the licensing that you've referred to, do

11 you do any administration?

12      A.    I do some.

13      Q.    Okay.  Do you administer any of

14 these songs you just mentioned?

15      A.    Yes.

16      Q.    As Hebrew Hustle, Inc.?

17      A.    Yes.

18      Q.    Okay.  Explain exactly how you

19 administer the songs you just mentioned.

20 Or how -- excuse me, how Hebrew Hustle,

21 Inc., administers the songs that you just

22 mentioned?

23      A.    We negotiate and send licenses

24 to the record label for the use and

Page 26

                    S. Hacker
1
2   register the copyrights and register with
3   the performing rights societies.
4       Q.    Okay.   That is the sole extent
5   of the administration that Hebrew Hustle
6   does in connection with any of its
7   publishing activities?
8       A.    There could be more.
9       Q.    Well, give my any further
10  administration activities other than what
11  you just mentioned, which is negotiating
12  the license agreement, the record label
13  and filing copyright registrations?
14      A.    Paying our songwriters.
15      Q.    Anything else?
16      A.    Registrations.
17      Q.    We went through that already.
18      A.    That's about it.
19      Q.    Okay.
20          MS. LEPERA:   I'm going to mark,
21  as Hacker 1, Notice of Rule 30(b)(6)
22  deposition.
23          (Exhibit Hacker 1, Notice of
24  Rule 30(b)(6) deposition, marked for
25  identification.)

1              S. Hacker

2      A.    No.

3      Q.    Okay.  So then, following

4  forward -- moving forward, what, if

5  anything, did you then learn about the

6  release of this third album by Drake prior

7  to its release?

8      A.    I recall him releasing a single,

9  "Started From The Bottom," which he

10  released, I believe, Grammy night.  And

11  that was the entrance, I guess you could

12  say, to the album.

13      Q.    Okay.  Do you recall when you

14  learned that or heard that?

15      A.    I said that in my last answer.

16      Q.    Okay.

17           MS. LEPERA:  Can you read the

18      witness's answer --

19  BY MS. LEPERA:

20      Q.    Actually, you -- you can answer

21  me again.  Answer the --

22      A.    Grammy -- the Grammy -- it would

23  be the twenty- -- 2013 Grammy awards.

24      Q.    That's when you heard the

25  single?

```
                         S. Hacker
```

1                          S. Hacker

2     A.     Yes.

3     Q.     Okay.  Is that when you first

4  learned that it was going to be released?

5     A.     Yes.

6     Q.     Or that it was released?  Okay.

7            After that period of time, what

8  if anything further did you hear or learn

9  about Drake's upcoming third album?

10    A.     Much of the same, that he was

11 working on it.  And I was submitting music

12 from my -- my producers and songwriters in

13 order to co-write or produce a record on

14 the album.

15    Q.     Who were you submitting your

16 music to?

17    A.     His management.

18    Q.     Specifically who?

19    A.     Oliver.

20    Q.     Anybody else?

21    A.     No.

22    Q.     Okay.  And what happened in

23 connection with your submissions?

24    A.     We spoke many times over e-mail,

25 and there was interest by Oliver in

1                   S. Hacker

2    several of the works.  He had asked me to

3    hold on to some of the works that I had

4    sent him, as Drake may be interested in

5    working as a joint work, adding his

6    portion to it.

7              And that's pretty much it, just

8    maintained communication, submitted music

9    in hopes of collaborating with Drake for

10   the album.

11       Q.    Uh-huh.  Those e-mails, do they

12   still exist?

13       A.    I should have some.

14       Q.    Okay.

15           MS. LEPERA:  I call for the

16   production of those e-mails as between

17   Mr. Drake's representatives and

18   Mr. Hacker that he's referring to.

19           MR. MOTTO:  We'll take it under

20   advisement.

21           MS. LEPERA:  Okay.  I would

22   believe they were largely encompassed

23   already, but we'll double-check that.

24   In any event, I'll call for their

25   production.

                        S. Hacker

1

2       Q.    And did you review any specific

3   Internet sites that discussed anticipated

4   songs that were going to be released on

5   the upcoming Drake album?

6       A.    Yes.

7       Q.    What sites were those?

8       A.    Billboard.com.

9       Q.    Anything else?

10      A.    RapRadar.com.

11      Q.    Anything else?

12      A.    Not that I recall.

13            (Exhibit Hacker 3, Document

14   Bates-numbered 0005 through 0011,

15   marked for identification.)

16            (Whereupon, a brief discussion

17   is held off the record.)

18   BY MS. LEPERA:

19      Q.    Now I'm showing you what we've

20   marked --

21            MS. LEPERA:  We're all set?

22   BY MS. LEPERA:

23      Q.    -- as Hacker 3, which are a

24   series of documents that have been

25   produced by you in this action and

1                    S. Hacker

2      Bates-stamped numbers 0005 through 0011.

3                    Can you tell me what these

4      e-mails refer to?

5           A.    I was attempting to establish

6      contact with the songwriter or publisher

7      for a composition known as "Jimmy Smith

8      Rap."

9           Q.    Okay.  So this e-mail is dated

10     September 17, 2013, correct?

11          A.    Uh-huh.

12          Q.    On the first page.

13                And then they continue and

14     they -- the last e-mail, even though

15     they're not in -- particularly in order

16     here, there is an e-mail dated

17     September 24, 2013.

18                So these e-mails took place

19     during the week of September 17, 2013 to

20     September 24, 2013, correct?

21          A.    Yes.

22          Q.    Okay.  What prompted you to

23     engage in this communication on

24     September 17, 2013 with, as you've

25     indicated, the Estate of Jimmy Smith?

1              S. Hacker

2       A.    I was searching online, on the

3    Internet, to possibly sign a songwriter or

4    songwriters that wrote compositions on

5    Drake's album, as music publishers often

6    do.   And I was attempting to locate the

7    parties that controlled the rights of

8    Jimmy Smith.

9       Q.    Okay.   Drake's album was

10   released on September 24th, correct?

11      A.    Uh-huh.

12      Q.    So how did you know what was on

13   Drake's album on September 17th?

14      A.    As I said, I was searching the

15   Internet and I came across the credits for

16   Drake's album, which listed "Jimmy Smith

17   Rap" as a sample on the album.

18      Q.    When was that?

19      A.    Around September 17th.

20      Q.    What site were the credits

21   listed for Drake's album that had not yet

22   been released?

23      A.    I can't remember.

24      Q.    So all the liner notes were

25   posted; is that what you're saying?

Page 43

1                    S. Hacker

2        A.    Correct.

3        Q.    And -- and you saw full liner

4    note description of all of the songs with

5    all of the credits of Drake's album before

6    it was released?

7        A.    Correct.

8        Q.    Okay.  And you cannot recall

9    where that site was?

10       A.    Correct.

11       Q.    Did you print out any copies?

12       A.    No.

13       Q.    Uh-huh.  And what did you do in

14   terms of communication, if anything, to

15   any of the Drake representatives that you

16   had been communicating with, with respect

17   to what you saw?

18       A.    Can you repeat that?

19            MS. LEPERA:  Can you read it

20       back?

21            (Whereupon, the question is read

22       back by the reporter.)

23       A.    Nothing.

24   BY MS. LEPERA:

25       Q.    Why not?

1                    S. Hacker

2      A.    Because this was an action that

3   had nothing to do with Drake's

4   representatives.

5      Q.    What action was that, that had

6   nothing to do with Drake's

7   representatives?

8      A.    Seeking to sign songwriters to

9   exclusive agreements.

10     Q.    With respect to material that

11  was going to be on Drake's album?

12     A.    Correct.

13     Q.    That has nothing to do with

14  Drake?

15     A.    Not exactly, no.

16     Q.    Okay.  So is it your testimony,

17  sir, that you saw, before Drake's album

18  was released, something indicating that on

19  one of his songs on his upcoming album

20  there was going to be something called the

21  "Jimmy Smith Rap"?

22           Is that -- is that correct?

23     A.    Yes.

24     Q.    That's your testimony, okay.

25           And you had no knowledge of what

1                    S. Hacker

2      the "Jimmy Smith Rap" was when you saw

3      that, correct?

4          A.    I'm not sure what you mean by

5      that.

6          Q.    Well, had you heard the "Jimmy

7      Smith Rap"?  Were you a fan of Jimmy

8      Smith?

9                You didn't know what the "Jimmy

10     Smith Rap" was when you saw this series of

11     credits, right?

12         A.    No, I did know what it was.

13         Q.    You did?  How did you know what

14     it was?

15         A.    Because when I was searching the

16     Internet and I came across the liner

17     notes, I also heard the "Jimmy Smith Rap."

18         Q.    Before that, sir?

19         A.    Pardon me?

20         Q.    Before you saw the liner notes

21     and found the "Jimmy Smith Rap" recorded

22     music was going to be, as you put it, in

23     Drake's forthcoming album that had not

24     been released, now disclosed; before that,

25     you had no knowledge of what the "Jimmy

1                    S. Hacker

2    Smith Rap" was, correct?

3         A.    Yes.

4         Q.    Correct -- I'm correct?

5         A.    Yes.

6         Q.    Okay.  So then when you saw that

7    you decided to go listen to it; is that

8    correct?

9         A.    Yes.

10        Q.    Okay.  Did you listen to

11   anything else that you saw on those

12   credits?

13        A.    Yes.

14        Q.    What else did you listen to?

15        A.    Different songs.

16        Q.    Okay.  Did you listen to

17   anything else for the purpose of signing

18   the songwriters or the publishing, as you

19   put it, to any of the music that was going

20   to be on Drake's album?

21        A.    There was a possibility.

22        Q.    Did you look to it for that

23   purpose?

24        A.    For what purpose?

25        Q.    Well, looking to see if you

1                      S. Hacker

2    could find ways to obtain rights to any of

3    the material that was going to be on

4    Drake's forthcoming album?

5        A.    Yes.

6        Q.    Okay.  So you were searching to

7    see whether or not there had been some

8    openings, let's say, for rights; is that

9    right?

10       A.    Yes.

11       Q.    Okay.  And you didn't

12   communicate this to anyone in connection

13   with the potential release of Drake's

14   album, correct?

15       A.    Correct.

16       Q.    Before the release?

17       A.    Yes.

18       Q.    That you were doing this; you

19   didn't communicate that, correct?

20       A.    Correct.

21       Q.    So your intent was to look for

22   openings in rights, sign those rights and

23   then disclose that to the Drake

24   representatives or others after the

25   release; was that your intent?

1                    S. Hacker

2       A.     Can you repeat that?

3              MS. LEPERA:   Read it back.

4              (Whereupon, the question is read

5       back by the reporter.)

6       A.     Yes.

7              MS. LEPERA:   Excuse me one

8       second.   I guess we do have to go off

9       the record for the coffee; I'm sorry.

10             THE VIDEOGRAPHER:   The time is

11      approximately 10:49 a.m.

12             We're off the record.

13             (Whereupon, a brief recess is

14      taken.)

15             THE VIDEOGRAPHER:   The time is

16      now 10:50 a.m.

17             We are on the record.

18      BY MS. LEPERA:

19      Q.     So going back to the liner notes

20      that you say you saw on a music website

21      prior to the release of the Drake third

22      album, what is it about that particular

23      "Jimmy Smith Rap" that made you think

24      there was, you know, a potential opening

25      for you to gain rights?

1                    S. Hacker

2        A.     Because I saw that the sound

3    recording was listed as being licensed and

4    there was no mention of publishing being

5    licensed.

6        Q.     Okay.  And did you look to see

7    that with respect to all of the samples

8    that you saw credited, as to whether or

9    not there was a -- both a master license

10   for the sound recording and a publishing

11   license?

12       A.     Yes.

13       Q.     So you were looking to see if

14   there were any openings in connection with

15   all of these samples; is that correct?

16       A.     I was looking for songwriters

17   who were writing on the album, whether

18   they were a sample or whether they were a

19   melody writer, whether they were a lyric

20   writer; any form of a songwriter that had

21   an opening where there was an opportunity

22   to represent their rights.

23       Q.     Okay.  And, again, you did all

24   this without any disclosure to anybody in

25   connection with the potential -- with the

```
 1                    S. Hacker
 2    anticipated release of the Drake's third
 3    album, correct?
 4         A.    Yes.
 5         Q.    And you have published materials
 6    online that indicate that you have a
 7    relationship with Cash Money, correct?
 8         A.    Yes.
 9         Q.    You still have a relationship
10    with Cash Money?
11         A.    Yes.
12         Q.    What is the nature of that
13    relationship?
14         A.    Producers that I represent and
15    songwriters that I represent contribute to
16    releases that they exploit.
17         Q.    Okay.  And who is your contact
18    at Cash Money, currently?
19              MR. MOTTO:  Objection to the
20         form of the question.
21    BY MS. LEPERA:
22         Q.    First, who do you speak to at
23    Cash Money?
24         A.    The CEO.
25         Q.    And who is that?
```

Page 51

                    S. Hacker

1

2      A.    Ryan "Baby" Williams.

3      Q.    Okay.  And when was the last

4  time you spoke to him?

5      A.    On the phone?  Is that what

6  you're asking?

7      Q.    Either way, phone, in person,

8  when was the last time you spoke to him?

9      A.    About two months ago.

10      Q.    And is he aware that you're

11  suing his company?

12      A.    Yes.

13      Q.    Okay.  And have you had any

14  communications with him about that?

15      A.    Yes.

16      Q.    And what have the communications

17  been?

18      A.    I told him before it was

19  happening that he should avoid it.

20      Q.    Okay.  And?  What -- what was

21  the response?

22      A.    He didn't really seem to care.

23      Q.    Was there any response, a verbal

24  response?

25      A.    Yeah.

1                    S. Hacker

2        Q.    What was the verbal response?

3        A.    "I'll look into it."

4        Q.    Okay.  And what date was this

5    conversation?

6        A.    I would say February of --

7    February before this was filed, two months

8    before the filing.

9        Q.    Okay.  How about prior to your

10    attempt to gain rights in certain

11    materials that were going to be on the

12    Drake album?  Did you communicate with him

13    about that then?

14        A.    No.

15        Q.    Did you communicate with anybody

16    at Cash Money about what you were

17    attempting to do?

18        A.    No.

19        Q.    Did you communicate with any

20    representatives of any of the other

21    defendants in connection with this action

22    prior to the release of Drake's album, as

23    to what your intent was in terms of trying

24    to gain rights to the "Jimmy Smith

25    Right" -- "Rap" before the release?

S. Hacker

1

2    A.    I'm going to need you to repeat

3    that.

4              MS. LEPERA:   You can read it

5        back to him.

6              (Whereupon, the question is read

7        back by the reporter.)

8    A.    No.

9    BY MS. LEPERA:

10   Q.    Okay.  Let's look back at

11   Exhibit 3.

12             When you wrote to -- by the way,

13   do you know who Jia is, or was when you

14   wrote to her?

15   A.    I knew that she was a

16   representative in some form to Jimmy

17   Smith's music.

18   Q.    How did you know that?

19   A.    Because she was listed as a

20   contact on the BMI database for some of

21   his works.

22   Q.    Okay.  So what was the first

23   step that you took when you saw the liner

24   notes prior to the release of the Drake

25   album reflecting the "Jimmy Smith Rap"

1          S. Hacker

2      Q.    Okay.  The last e-mail of Ms. --

3  Jia, which is page 10, second-to-last page

4  of this exhibit, it says at the top, "Hi,

5  Stephen.  I have forwarded your request.

6  They will be contacting you shortly."

7          Do you -- did you know at that

8  point in time who "they" were?

9      A.    No.

10     Q.    Okay.  Looking at your e-mail to

11 her -- now, this is later, September 24,

12 2013, you -- you state here to her that

13 "It could" -- in the third paragraph; I'm

14 going to quote.

15          MR. MOTTO:  Is this page 7?

16          MS. LEPERA:  Yes.

17 BY MS. LEPERA:

18     Q.    Quote, It could very well be

19 that a PA copyright form was never filed

20 for the underlying composition because the

21 Elektra label was not going to pay out

22 mechanical royalties on this title because

23 it was simply an outro speech.  That would

24 take care of the label not paying

25 mechanical royalties from the -- is that

1               S. Hacker

2    Over the Top? -- album sales to the

3    writer.

4               And then you continue, "But what

5    if the underlying composition was to be

6    exploited in another medium down the

7    line?"

8               Do you see that sentence?

9         A.    Yes.

10        Q.    And you wrote that sentence?

11        A.    Yes.

12        Q.    Okay.  And when you wrote that

13   sentence, you were aware, were you not,

14   that there had never been any mechanical

15   royalties or copyright registration filed

16   in connection with the, quote, outro

17   speech, that is the underlying words on

18   the "Jimmy Smith Rap" recording, correct?

19        A.    No.

20        Q.    You were not aware of that?

21        A.    I didn't know if there were any

22   mechanical royalties that may have been

23   paid to Jimmy Smith or his estate at that

24   point.  I just knew that there was not a

25   copyright registration filed.

1                    S. Hacker

2    question.

3        Q.    Oh.  Well, you say there was no

4    mechanical royalty or license paid in

5    connection with the outro speech, the

6    "Jimmy Smith Rap" words on the Over the

7    Top album, correct?

8        A.    That's my understanding.

9        Q.    Okay.  So how was that licensed?

10        A.    To who?

11        Q.    To whoever exploited it?

12        A.    I wasn't around when it was

13    original -- when those agreements or

14    licenses were done for all the

15    compositions on the album, so I don't

16    know.

17        Q.    Have you seen any mechanical

18    royalties or any publishing -- publishing

19    royalties, performance, any type of

20    publishing-related income for the outro

21    speech that is the Jimmy Smith words on

22    the recording "Jimmy Smith Rap" from the

23    beginning of time to today?

24        A.    No.

25        Q.    And you, in fact, are well aware

S. Hacker

1
2    respect to the composition?

3        A.     Nothing at this time.

4        Q.     What is in the works, if

5    anything, with respect to any of the

6    publishing rights Hebrew Hustle

7    purportedly got in connection with the

8    composition, other than to proceed with

9    this lawsuit?

10       A.     If somebody else wanted to use

11   the composition, we would engage in a

12   licensing agreement for that.

13       Q.     That's not what I asked you.

14              MS. LEPERA:  Move to strike.

15   BY MS. LEPERA:

16       Q.     What else has Hebrew Hustle done

17   to exploit the purported composition other

18   than engage in this lawsuit?

19       A.     I think that was your previous

20   question, not the question that you just

21   asked me.

22       Q.     I'm asking it again because I'm

23   not getting an answer, so I'm asking this

24   question a different way to make sure

25   we're on the same page.

Page 76

                         S. Hacker

1

2      A.    I said, at this time, nothing

3  else besides the registering, filing of

4  the copyright and trying to correct this

5  infringement.

6      Q.    Okay.  And what about -- is

7  anything contemplated to be done to

8  license the composition for any use?

9           And when -- again, when I say

10  "composition," I'm not conceding it's a

11  composition.

12           Anything contemplated?

13      A.    If somebody would like to use

14  the composition, they would contact the

15  appropriate party, which would be me, and

16  we would license or try to work out an

17  agreement with them.

18      Q.    Is anything contemplated by

19  you -- is anything contemplated by you as

20  the publisher?

21      A.    No.

22      Q.    So is it correct, Mr. Hacker,

23  that the only reason why you went out to

24  obtain what you call the rights in this

25  spoken word outro was so that you could

Page 77

                    S. Hacker

1
2    sue Cash Money, Drake and the rest of the

3    defendants?

4        A.    No.

5        Q.    Well, what other reason was

6    there to get it, since you haven't done

7    anything with it?

8        A.    We attempted to resolve this

9    pre-litigation.

10       Q.    Okay.  Let me -- let me then ask

11   this:  Isn't, in fact, the only reason why

12   you went out and obtained the rights in

13   this so-called composition so that you

14   could seek to get money from Drake and the

15   other defendants in connection with the

16   third album, correct?

17       A.    Yes.

18       Q.    The publishing agreement doesn't

19   say any of that, correct?

20       A.    Say any of what?

21       Q.    That that was the motivation and

22   the intent behind obtaining the rights?

23              MR. MOTTO:  Objection to the

24       form of the question.

25       A.    No.

1                S. Hacker

2           MR. MOTTO:   Objection to the

3      form of the question.

4      A.    He's actually listed on the back

5   of the album, once I obtained a copy of

6   the album, as the only person who is

7   attached to that title.

8   BY MS. LEPERA:

9      Q.    Well, let's be clear.   You

10   looked at the actual liner notes for the

11   Jimmy Smith albums, correct?

12      A.    Correct.

13      Q.    And you agree with me there's

14   not a single reference to any songwriter

15   or author to any of the words on the

16   "Jimmy Smith Rap," correct?

17      A.    No.

18      Q.    You don't agree with me?

19      A.    No.

20      Q.    Okay.

21           MS. LEPERA:   Let's mark this.

22           We're going to mark this and --

23      and keep the original.   Let's just put

24      it on here as Hacker 5.

25           (Whereupon, a brief discussion

```
1                    S. Hacker
2        is held off the record.)
3              (Exhibit Hacker 5, Jimmy Smith
4        album cover and record, marked for
5        identification.)
6   BY MS. LEPERA:
7        Q.    Okay.  I'm going to show --
8              MR. MOTTO:  May -- may I see
9        that, before --
10             MS. LEPERA:  Yes.
11  BY MS. LEPERA:
12       Q.    I'm going to show you -- well,
13  let's not get fingerprints on it.  You can
14  take a look at it.
15             MR. MOTTO:  Can I see the --
16             MS. LEPERA:  Yeah, sure.
17             Okay, thank you.
18  BY MS. LEPERA:
19       Q.    Okay.  I'm going to -- because
20  we only have one copy of this, and
21  obviously we can try to make copies of
22  it -- I am going to show the witness the
23  two sides of the Off The Top vinyl album
24  of Jimmy Smith.
25             The -- Side 1 has three tracks.
```

                        S. Hacker

1

2      haven't seen that.

3           MR. MOTTO:   I think we've

4      produced it, but I'll check.   If we

5      haven't produced it, we'll produce it.

6           MS. LEPERA:   And maybe on a

7      break, if -- if you could look to see

8      if this --

9           MR. MOTTO:   I got a thousand

10     pages of documents.

11          MS. LEPERA:   -- or talk to your

12     client and maybe he can tell you

13     exactly --

14   BY MS. LEPERA:

15        Q.    What site was it on, by the way?

16        A.    Google.

17        Q.    Google.   Okay.

18             So other than this document that

19   we don't have in front of us, can you tell

20   me any information that you have from any

21   eyewitness source as to who wrote the

22   words on the "Jimmy Smith Rap"?

23        A.    I've never spoken to any

24   eyewitnesses that were in the studio when

25   that was composed.

1                    S. Hacker

2        Q.    Did you discuss what you were

3    looking for with him at all --

4        A.    No.

5        Q.    -- specifically?

6              And -- and -- okay.

7              Did you discuss specifically

8    with anyone, representative of any of the

9    defendants, what you were looking for?

10       A.    I've left that to the attorneys.

11       Q.    Okay.  Have you had any

12   communications with anyone connected with

13   Young Money regarding this claim?

14       A.    Yes.

15       Q.    And with whom?

16       A.    A gentleman by the name of

17   Jermaine Preyan.

18       Q.    And who is Jermaine Preyan?

19       A.    He is -- he's known as Mack

20   Maine.  I would say he is the day-to-day

21   representative of Young Money, if you

22   will.

23       Q.    Okay.  And tell me, first, when

24   you had this communication with Jermaine?

25       A.    He called me, similar to the

Page 103

S. Hacker

1
2      conversation with Mr. Williams, trying to
3      get ahold of what's going on after months
4      of back-and-forth communication with the
5      respective attorneys.  And he was a bit
6      belligerent on the phone.  Some of my
7      clients have worked and have a continued
8      working relationship with Little Wayne
9      from Young Money, so he -- he told me,
10     Look, you know, you do a lot of work with
11     us.  Why are you suing us?  What's this
12     all about?
13              And I said, you know, Look, this
14     is -- this is to do with, you know, a song
15     that I have rights in, and we've tried to
16     clear it all up with, you know, with the
17     respective parties.
18              And he just didn't really seem
19     to understand what was going on for months
20     behind the scenes and just wanted to get
21     aggressive, and it didn't really go
22     anywhere.
23        Q.    Was this after the lawsuit or
24     before the lawsuit?
25        A.    This was after.

1                    S. Hacker

2        Q.    Okay.  Are these the first

3    written communications that you had with

4    Mr. Janifer -- Janifer, period, concerning

5    this matter or otherwise?

6        A.    Yes.

7        Q.    Okay.  Had you had a phone call

8    with him prior to this?

9        A.    Yes.

10       Q.    Okay.  Can you identify

11   approximately when you had your initial

12   first verbal communication with

13   Mr. Janifer?

14       A.    Wednesday, September 25th.

15       Q.    And how is it you remember that

16   so precisely?

17       A.    Because if you look at the first

18   e-mail at the end of the exhibit that you

19   just gave me, it states, "Raymond, it was

20   a pleasure chatting this morning" --

21       Q.    And that was --

22       A.    -- and that's dated Wednesday,

23   September 25th.

24       Q.    And that was your first verbal

25   communication with him?

1                    S. Hacker

2        A.     Yes.

3        Q.     Okay.   And this is the day after

4    the album release; is that correct?

5        A.     Yes.

6        Q.     Okay.   Do you see that you have

7    on the second page here a comment about

8    filing the Form PA?

9               "First and foremost" --

10              (Whereupon, a brief discussion

11       is held off the record.)

12   BY MS. LEPERA:

13       Q.     Quote, First and foremost, a

14   Form PA must be filed with the United

15   States Copyright Office.

16              Do you see this reference on the

17   second -- on the last page of the exhibit

18   in your September 25th e-mail

19   communication?

20       A.     Yes, I see it.

21       Q.     Okay.   And then you go on to

22   say, quote, This is the key to the federal

23   courthouse door.

24              Do you see that?

25       A.     Yes.

1                    S. Hacker

2      correct?

3          A.      Potentially.

4          Q.      Okay.  And so, obviously, if you

5      in fact have a claim for, quote, potential

6      infringement damages, wouldn't you say

7      that is potentially more valuable than

8      simply getting a license in advance of a

9      use?

10         A.      Potentially.

11         Q.      And you knew that, correct?

12         A.      Uh-huh.

13         Q.      Can you --

14         A.      Yes.

15         Q.      -- say that audibly?  Okay.

16                 So why didn't you go to any of

17     your sources, whether it be Young Money or

18     Cash Money or Drake's people, before you

19     reached out to the Jimmy Smith estate and

20     said -- Jimmy Smith estate and say, I'm

21     acquiring rights to this; let's make a

22     deal?

23         A.      I didn't have the rights to --

24     in my possession.

25         Q.      But you were going to get them.

1                    S. Hacker

2        A.    I don't approach people until I

3    actually have rights to something.   That

4    would be premature.

5        Q.    Okay.  But you knew you were

6    intent on doing so, correct?

7        A.    Yes.

8        Q.    Okay.  You could have

9    communicated that, correct?

10       A.    Why?

11       Q.    Why not?

12       A.    I didn't see the point of --

13       Q.    Well, you wouldn't see the point

14   of saying, I'm going to sue you after you

15   release this album, so why don't you --

16   because I'm going to go get these rights,

17   or I'm -- I'm in the process of getting

18   these rights; why don't you -- let's talk

19   about this?

20             You didn't do any of that,

21   right?

22       A.    My lawyers did that after --

23       Q.    Before the release of the album.

24             Your lawyers didn't do anything

25   before the release of the album, correct?

1                     S. Hacker

2        A.     Correct.

3        Q.     Okay.  Why didn't you do that

4    before the release of the album?

5        A.     I didn't want to.

6        Q.     Why not?

7        A.     I didn't -- like I said, it was

8    not apropos to approach somebody without

9    having the rights in the material.

10       Q.     But it's apropos to let them sit

11   back and not know that you're going out to

12   get the rights when there's an imminent

13   release?  That's apropos?

14       A.     There's no obligation to contact

15   a record label if you're interested in

16   signing a songwriter on the album.

17       Q.     Says who?

18       A.     It's a separate --

19       Q.     Are you a lawyer?

20             MR. MOTTO:  Can you let him

21       respond?

22       A.     I'm a music publisher.

23   BY MS. LEPERA:

24       Q.     Okay.  My point is simply this,

25   sir.  You had the full opportunity and you

1                    S. Hacker

2     chose not to communicate with people you

3     were attempting to do business with that

4     you were seeking to obtain rights on a

5     track that was going to be imminently

6     released on a wide scale, correct?

7         A.    Correct.

8         Q.    Okay.

9              MS. LEPERA:  Okay.  We're up to

10        8, right?

11              This is Hacker 8.

12              (Exhibit Hacker 8, Document

13        entitled Public Catalog, marked for

14        identification.)

15              MS. LEPERA:  While we're at it,

16        let's do Hacker 9.

17              (Whereupon, a brief discussion

18        is held off the record.)

19              MS. LEPERA:  Yeah, I'm not doing

20        Hacker 9 right now.  Okay.

21              (Whereupon, a brief discussion

22        is held off the record.)

23    BY MS. LEPERA:

24        Q.    Okay.  So, Mr. Hacker, I'm

25    showing you a -- a series of printouts

1                    S. Hacker

2     or Dr. Janifer?

3         A.    Yes.

4         Q.    Did you make these notes close

5     in time to when you testified that you

6     first found the liner notes of the Drake

7     forthcoming album on the Internet?

8         A.    Yes.

9         Q.    So sometime in -- in or around

10    September 17, 2013?

11        A.    Yes.

12        Q.    But not much prior to that,

13    correct?

14        A.    Correct.

15        Q.    Because you didn't know about

16    any of the tracks on the forthcoming Drake

17    album prior to seeing the liner notes,

18    correct?

19        A.    Correct.

20        Q.    Can you identify where on the

21    Internet you saw this set of liner note

22    credits, which website?

23        A.    I can't recall.

24        Q.    Did you take any -- did you

25    print it out?

```
 1                    S. Hacker
 2        A.     No.
 3        Q.     Print out the liner notes?
 4               Did you make any notes of the
 5   credits from the liner notes?
 6        A.     No.
 7        Q.     But you're a hundred percent
 8   sure that's when the first time you found
 9   any information relating to this Jimmy
10   Smith sample to be on the forthcoming --
11   sample to be on the forthcoming Drake
12   album?
13        A.     Yes.
14               MS. LEPERA:  This is 14.
15               (Exhibit Hacker 14, Document
16        Bates-numbered 0031 through 0034,
17        marked for identification.)
18   BY MS. LEPERA:
19        Q.     You testified earlier that you
20   were not at BMI -- Hebrew Hustle was
21   not -- had no BMI affiliation prior to
22   your involvement with the Jimmy Smith
23   outro, correct?
24        A.     Yes.
25        Q.     Okay.  And that you determined
```

1                    S. Hacker

2        Q.     Is that also your business

3    address?

4        A.     Yes.

5        Q.     So you work out of your home?

6        A.     Yes.

7        Q.     And Hebrew Hustle works out of

8    your home?

9        A.     Yes.

10       Q.     And Spliffington Management

11   works out of your home?

12       A.     Yes.

13              MS. LEPERA:   21.

14              (Exhibit Hacker 21, Document

15       Bates-numbered 0053 and 0054, marked

16       for identification.)

17   BY MS. LEPERA:

18       Q.     If you'd take a moment and look

19   at what we've marked as 21, a document

20   produced by plaintiffs, 0053, 0054,

21   appears to be an e-mail from you to

22   Dr. Janifer, February 25, 2014.

23              Do you recognize this document?

24       A.     Yes.

25       Q.     Did you send this document to

Page 185

                    S. Hacker

1    Mr. Janifer in or about that time

2    attaching, as referred to in your e-mail,

3    an affidavit and, quote, the exact same

4    publishing agreement that you signed and

5    sent back to me on October 24, 2013, close

6    quote?

7        A.    Yes.

8        Q.    Okay.  Who drafted the

9    affidavit, if you know, that's referred to

10   on the bottom of the page?

11       A.    I believe counsel.

12       Q.    And you didn't draft it

13   yourself, did you?

14       A.    No.

15       Q.    Okay.  And did you send this

16   document then to Mr. Janifer to have his

17   mother -- to Dr. Janifer to have his

18   mother sign?

19       A.    Yes.

20       Q.    Okay.  And this, as we discussed

21   earlier, was in response to a query as to

22   whether or not she had been the signatory

23   on the original publishing agreement?

24       A.    That's correct.

1            S. Hacker

2            (Whereupon, a brief recess is

3      taken.)

4            (Exhibit Hacker 24, Document

5      Bates-numbered 0120 through 0121,

6      marked for identification.)

7            THE VIDEOGRAPHER:  The time is

8      now 3:28 p.m.  This is the beginning

9      of Disk No. 4.

10            We are on the record.

11 BY MS. LEPERA:

12      Q.    Mr. Hacker, I'm showing you

13 Exhibit 24.

14            Can you identify this document

15 for me?

16      A.    Yes.  It's a transfer of

17 copyright document.

18      Q.    From what -- from whom to -- to

19 whom in connection with what?

20      A.    From the Estate of James Oscar

21 Smith to Hebrew Hustle for the title

22 "Jimmy Smith Rap."

23      Q.    And at the top there's a header;

24 it says, March 17, 2014, 10:39 p.m., Anita

25 M. Smith Johnson, and a -- and a fax

1                    S. Hacker

2    number.

3                    Do you see that?

4        A.    Yes.

5        Q.    Is that at or around the time

6    that you got this document signed by -- by

7    Anita Johnson?

8        A.    Yep.

9        Q.    Yes?

10       A.    Yes.

11       Q.    And attached to this transfer of

12   copyright is the affidavit that we had

13   looked at previously in draft, correct?

14       A.    Yes.

15       Q.    Executed by Ms. Johnson.

16             Yes?

17       A.    Yes.

18       Q.    Okay.  Can I ask you to tell me

19   what is the good and valuable

20   consideration that Hebrew Hustle gave to

21   the estate for the transfer of the

22   copyright?

23             MR. MOTTO:  Objection to the

24        form of the question.

25       A.    The services of a music