UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------
                                        :
ESTATE OF JAMES OSCAR SMITH, *et*       :
*ano*.,                                 :
                                        :
                Plaintiffs,             :          14cv2703
                                        :
        -against-                       :          OPINION & ORDER
                                        :
CASH MONEY RECORDS, INC., *et al.*,     :
                                        :
                Defendants.             :
----------------------------------------

WILLIAM H. PAULEY III, District Judge:

    Plaintiffs the Estate of James Oscar Smith (the "Estate") and Hebrew Hustle, Inc.,

bring this copyright infringement action against Defendants Cash Money Records, Inc.,

Universal Republic Records, UMG Recordings, Inc., Universal Music Group Distribution, Corp.,

EMI Music Publishing Management, LLC, Universal Music-MGB NA, LLC, Warner/Chappell

Music, Inc., Sony/ATV Music Publishing, LLC, Aubrey Drake Graham, Mathew Jehu Samuels,

Jordan Evans, Apple, Inc., and Amazon Digital Services, Inc. (collectively, "Defendants").

Plaintiffs and Defendants both move for summary judgment.  For the reasons that follow,

Plaintiffs' motion is denied and Defendants' motion is granted.

BACKGROUND

    In 1982, Jimmy Smith recorded an album released by Elektra/Asylum Records

titled *Off the Top*.  (Joint Rule 56.1 Statement ("Joint Statement"), ¶ 7.)  The first six tracks are

purely instrumental, and the last track is a spoken-word recording titled "Jimmy Smith Rap"

("JSR").  The lyrics to JSR are:

Good God Almighty, like back in the old days

You know, years ago they had the A&R men to tell you what to play, how to play it and you know whether it's disco rock, but we just told Bruce that we want a straight edge jazz so we got the fellas together Grady Tate, Ron Carter, George Benson, Stanley Turrentine.

Stanley was coming off a cool jazz festival, Ron was coming off a cool jazz festival.  And we just went in the studio and we did it.

We had the champagne in the studio, of course, you know, compliments of the company and we just laid back and did it.

Also, Grady Tate's wife brought us down some home cooked chicken and we just laid back and we was chomping on chicken and having a ball.

Jazz is the only real music that's gonna last.  All that other bullshit is here today and gone tomorrow.  But jazz was, is and always will be.

We may not do this sort of recording again, I may not get with the fellas again.  George, Ron, Grady Tate, Stanley Turrentine.

So we hope you enjoy listening to this album half as much as we enjoyed playing it for you.
Because we had a ball.

(Joint Statement ¶ 10.)

The label on each side of the record lists each song with the composer in parentheses, except for JSR, which lists no writer.  (Joint Statement ¶¶ 11, 12.)  Although Raymond Janifer, Jimmy Smith's nephew and co-manager of the Estate, was not present at the recording of JSR, he recalls Jimmy Smith telling him that he "laid down a dynamite rap on them and hope they don't cut it off the album."  (Oct. 14, 2015 Declaration of Raymond Janifer ("Janifer Decl."), ECF No. 99, at ¶ 7.)  Janifer also explained that Jimmy Smith did not write music, but instead made the music and words up in his head and then performed and recorded on tape.  (Janifer Decl., ¶ 5.)  Additionally, the website www.discogs.com lists Jimmy Smith as the author of JSR.  (Oct. 12, 2015 Declaration of Stephen Hacker ("Hacker Decl."), Ex. 1.)

In April 2013, the Estate entered into an Administration Agreement with Modern Works Music Publishing ("Modern Works").  (Joint Statement ¶ 6.)  The Agreement designated Modern Works as the "sole and exclusive Administrator" for the Estate (Joint Statement, Ex. A, ¶ 6), while noting that "[o]wnership remain[ed] with" the Estate (Joint Statement, Ex. A, ¶4).  Modern Works agreed to register "all claims to copyright in the Compositions . . . with the United States Copyright Office" in the Estate's name.  (Joint Statement, Ex. A, ¶ 6.))  In return, the Estate conferred on Modern Works "the exclusive right to administer and exploit the Compositions throughout the Territory during the Term."  (Joint Statement, Ex. A., ¶ 6.)  A contemporaneous document explained that the Estate "entered into a worldwide, full-catalog administration agreement for the Compositions." (Joint Statement, Ex. A., at 13.)

On September 24, 2013, Cash Money Records and Universal Republic Records released an album titled *Nothing Was the Same* (the "Album") by Aubrey Drake Graham ("Drake").  (Joint Statement ¶¶ 30–34.)  The last song on the Album is "Pound Cake/Paris Morton Music 2" ("Pound Cake").  (Joint Statement ¶ 35.)  The opening to Pound Cake samples about 35 seconds of JSR.  The sampled portions are:

Good God Almighty, like back in the old days.

You know, years ago they had the A&R men to tell you what to play, how to play it and you know whether it's disco rock, but we just went in the studio and we did it.

We had champagne in the studio, of course, you know, compliments of the company, and we just laid back and did it.

So we hope you enjoy listening to this album half as much as we enjoyed playing it for you.  Because we had a ball.

Only real music is gonna last, all that other bullshit is here today and gone tomorrow.

(Joint Statement, Ex. D.)  While some words from JSR were rearranged or deleted, no words were added.  (See (Oct. 20, 2015 Jeffrey Movit Declaration ("Movit Decl."), ECF No. 94, at Ex. 5.)

In producing the Album, Cash Money arranged for a music licensing company to ensure that parties obtained all necessary licenses.  (Oct. 19, 2015 Declaration of Edward Grauer ("Grauer Decl."), ECF No. 93, ¶ 3.)  Defendants obtained a license for the JSR recording, but not for the JSR composition.  (Joint Statement ¶¶ 36, 42.)  The JSR composition copyright was not registered with the U.S. Copyright Office or any performing rights organization prior to the Album's release.  (Joint Statement ¶¶ 17, 31, 55, 57.)  The Estate maintains that it would not have granted a license for the composition because Jimmy Smith "wasn't a fan of hip hop."  (Joint Statement ¶ 42.)  The JSR recording license stated that Defendants received "all requisite consents and permissions of . . . the copyright owners of the musical composition."  (Joint Statement ¶ 36.)

Stephen Hacker is the principal of Hebrew Hustle, a music publisher that represents songwriters in negotiating the licensing of copyrights.  (Joint Statement ¶ 43–44.)  Prior to the release of the Album, Hacker had ongoing business relationships with many of the Defendants.  (Joint Statement ¶ 47.)

Approximately one week before the Album's release, Hacker reviewed an advance copy of the credits "to look for openings in rights, sign those rights and then disclose that to the Drake representatives" after the release of the Album.  (Joint Statement ¶¶ 49, 51.)  Hacker noticed that Defendants had secured a license for the recording of JSR, but not for the composition.  (Joint Statement ¶ 49.)  He reached out to Janifer to alert the Estate of Defendants' use of the JSR composition in the Album.  (Joint Statement ¶ 54.)  Thereafter, the Estate entered

into a co-publishing agreement with Hebrew Hustle, assigning 50% of the copyright in the JSR composition to Hebrew Hustle and granting an exclusive right to exploit it.  (Joint Statement, Ex. G.)  Hebrew Hustle registered the JSR composition with the U.S. Copyright Office on October 23, 2013 in the name of Hebrew Hustle.  (Joint Statement ¶¶ 55, 57.)  Two months after the Album's release, the Estate's counsel sent a cease and desist letter, which was the first time Defendants learned of any alleged composition copyright interest in JSR.  (Grauer Decl., ¶ 5.)

<u>LEGAL STANDARD</u>

Summary judgment is appropriate only where all of the submissions taken together "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986).  Material facts are "facts that might affect the outcome of the suit under the governing law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute is genuine only if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." <u>Anderson</u>, 477 U.S. at 249.

The role of a court in ruling on such a motion "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party."  <u>Knight v. United States Fire Ins. Co.</u>, 804 F.2d 9, 11 (2d Cir. 1986).  "[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment, and a district court deciding a summary judgment motion has broad discretion in choosing whether to admit evidence."  <u>Porter v. Quarantillo</u>, 722 F.3d 94, 97 (2d Cir. 2013) (citations and internal quotations omitted).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a

genuine issue of material fact where none would otherwise exist." <u>Hicks v. Baines</u>, 593 F.3d

159, 166 (2d Cir.2010) (citations omitted).  In addition, self-serving, conclusory affidavits,

standing alone, are insufficient to create a triable issue of fact and to defeat a motion for

summary judgment.  <u>See</u> <u>BellSouth Telecommunications, Inc. v. W.R. Grace & Co.-Conn.</u>, 77

F.3d 603, 615 (2d Cir. 1996).

<u>DISCUSSION</u>

I.      <u>COPYRIGHT INFRINGEMENT</u>

"To establish infringement, two elements must be proven: (1) ownership of a

valid copyright, and (2) copying of constituent elements of the work that are original." <u>Feist</u>

<u>Publications, Inc. v. Rural Tel. Serv. Co.</u>, 499 U.S. 340, 361 (1991).  Defendants argue that

neither element is satisfied: Plaintiffs have no evidence that Jimmy Smith wrote JSR, and JSR

and Pound Cake are not substantially similar.

**a.   Ownership of a Copyright**

In a copyright infringement suit, the plaintiff bears the initial burden of coming

forward with evidence that it possesses a valid copyright.  <u>See</u> <u>Langman Fabrics, a div. of Blocks</u>

<u>Fashion Fabrics, Inc. v. Graff Californiawear, Inc.</u>, 160 F.3d 106, 111 (2d Cir.), <u>amended,</u> 169

F.3d 782 (2d Cir. 1998).  "Copyright in a work . . . vests initially in the author or authors of the

work."  17 U.S.C. § 201.  The "author" is the person who translates an original and minimally

creative idea into a fixed, tangible expression.  <u>See</u> <u>Medforms, Inc. v. Healthcare Mgmt. Sols.,</u>

<u>Inc.</u>, 290 F.3d 98 (2d Cir. 2002).  The Estate derives its copyright from Jimmy Smith, who

passed away in February 2005.  For the Estate to hold the copyright, Jimmy Smith must have

owned the copyright as the author of the work.  However, the record evidence does not resolve

the question of JSR's authorship.

As an initial matter, this Court affords the January 2013 registration of the composition copyright in JSR minimal weight.  While copyright registration normally constitutes prima facie evidence of validity, "[t]he evidentiary weight to be accorded the certificate of a registration made [more than five years after the first publication] shall be within the discretion of the court."  17 U.S.C. § 410(c).  Here, the Estate registered the JSR composition copyright thirty-one years after initial publication, and only in response to Defendants' sampling of JSR on the Album.  "Accordingly, the registration does not constitute prima facie evidence that the copyright is valid, and [Plaintiff] has the burden of proving the validity of its copyright."  Tuff 'N' Rumble Mgmt., Inc. v. Profile Records, Inc., No. 95-CV-0246, 1997 WL 158364, at *2 (S.D.N.Y. Apr. 2, 1997).

The lyrics of JSR indicate that it is a behind-the-scenes recollection of the recording of *Off the Top*.  Indeed, the statement on the *Off the Top* album cover explains that it was recorded with "no charts, music format or nothing . . . just playing what we felt . . . off the top of our heads."  (Joint Statement, Ex. I.)  But this information only speaks to the process of recording *Off the Top*, and not necessarily to the authorship of JSR.[1]  Interpreting this in the light most favorable to the non-moving party creates a dispute of material fact.

Similarly, Janifer asserted that Jimmy Smith did not write music by putting pen to paper, instead making the words up in his head before performing and recording the sounds on tape.  (Janifer Decl., at ¶¶ 5–8.)[2]  But Janifer did not witness Jimmy Smith record JSR, and that lack of firsthand knowledge makes his testimony less probative.  See Fed. R. Evid. 602 ("A

---

[1]      Defendants claim the statement on the album is unauthenticated hearsay.  But this statement is subject to the exception in Rule 803 of the Federal Rules of Evidence as a "statement in a document that is at least 20 years old and whose authenticity is established."  Fed. R. Evid. 803(16).

[2]      Rule 406 of the Federal Rules of Evidence permits "[e]vidence of a person's habit or an organization's routine practice [to] be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice."

witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter.").

Janifer also claims that, prior to the release of *Off the Top*, Jimmy Smith told him "I laid down the dynamite rap on them and I hope they don't cut it from the album." (Janifer Decl., at ¶ 7.)  Hearsay problems aside, there is no indication that Jimmy Smith was referring to JSR and not to some other song that was, in fact, cut from the album.

The song listings for *Off the Top* are similarly unhelpful, as they list the writers of each song except JSR. (Joint Statement, Ex. I.)  Although the album's original packaging contained a copyright notice that listed "Elektra/Asylum Records" as the copyright claimant for the sound recordings and any other uncredited material (Joint Statement ¶ 14), such a notice must "be placed on publicly distributed copies from which the work can be visually perceived."  17 U.S.C. § 401(a); Circular 3.0213 of the U.S. Copyright Office (noting that the C in a circle applied to phonorecords "is not used to indicate protection of the underlying musical, dramatic, or literary work that is recorded").  Because the lyrics were not displayed on the album jacket, they could not be visually perceived.  Plaintiffs' suggestion that there was no need to list the author of JSR because it was self-evident is circular and therefore cannot support summary judgment.

The fact that a single music-focused website recognizes Jimmy Smith as the author does not advance the inquiry.  The website www.discogs.com, which Plaintiffs claim is a commonly used and relied-upon source, lists Jimmy Smith as the author of JSR.[3]  (Hacker Decl., Ex. 1.)  But that website is a user-built database, and anyone can contribute to it.  See

---

[3]       The website is relied on by individuals in the music industry (Hacker Decl., ¶ 3) and qualifies as a "Market Reports and Similar Commercial Publications" under Rule 803(17) of the Federal Rules of Evidence.

www.discogs.com/about.  There is no evidence that whoever entered the data had any personal knowledge of JSR's authorship.

Ultimately, a genuine issue of material fact exists as to the authorship of JSR. Accordingly, summary judgment is not appropriate on this issue.

### b.  Substantial Similarity

"In order to establish a claim of copyright infringement, a plaintiff with a valid copyright must demonstrate that: (1) the defendant has actually copied the plaintiff's work; and (2) the copying is illegal because a substantial similarity exists between the defendant's work and the protectible elements of plaintiff's."  Peter F. Gaito Architecture, LLC v. Simone Dev. Corp., 602 F.3d 57, 63 (2d Cir. 2010) (internal quotation marks omitted).  "In general, the question of substantial similarity is a close question of fact; therefore, summary judgment has traditionally been frowned upon in copyright litigation.  Yet, summary judgment may be granted when any similarity concerns non-protectable elements or no reasonable trier of fact could find the works substantially similar."  Crane v. Poetic Prod. Ltd., 593 F. Supp. 2d 585, 591 (S.D.N.Y.) (internal quotation marks omitted), aff'd, 351 F. App'x 516 (2d Cir. 2009).

Multiple tests exist to determine substantial similarity, including the "ordinary observer test," the "comprehensive non-literal test," and the "fragmented literal similarity test." See Castle Rock Entm't, Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 140 (2d Cir. 1998). Defendants argue for the application of the ordinary observer test, while Plaintiffs maintain that the fragmented literal similarity test is appropriate.[4]

---

[4]        "[T]he 'comprehensive nonliteral similarity' test . . . examines whether the fundamental essence or structure of one work is duplicated in another."  Castle Rock, 150 F.3d at 140 (internal quotation marks omitted). Because this action involves direct copying, the "comprehensive nonliteral similarity" test is inapposite.

The ordinary observer test is the "standard test for substantial similarity."  Peter F. Gaito, 602 F.3d at 66.  It asks "whether an ordinary observer, unless he set out to detect the disparities, would be disposed to overlook them, and regard the aesthetic appeal as the same." Peter F. Gaito, 602 F.3d at 66 (internal quotation marks and alterations omitted).

By contrast, "fragmented literal similarity exists where the defendant copies a portion of the plaintiff's work exactly or nearly exactly, without appropriating the work's overall essence or structure."  TufAmerica, Inc. v. Diamond, 968 F. Supp. 2d 588, 597 (S.D.N.Y. 2013) (citing Newton v. Diamond, 388 F.3d 1189, 1194 (9th Cir. 2004)).  Under the fragmented literal similarity test, "the question of substantial similarity is determined by an analysis of 'whether the copying goes to trivial or substantial elements' of the original work."  TufAmerica, 968 F. Supp 2d at 598; 4-13 Nimmer on Copyright § 13.03 ("The question . . . is whether the similarity relates to matter that constitutes a substantial portion of plaintiff's work—not whether such material constitutes a substantial portion of defendant's work.").

Both tests ask "whether 'the copying is quantitatively and qualitatively sufficient' to support a finding of infringement."  Nihon Keizai Shimbun, Inc. v. Comline Bus. Data, Inc., 166 F.3d 65, 70 (2d Cir. 1999).  "It is only where the points of dissimilarity exceed those that are similar and those similar are—when compared to the original work—of small import quantitatively or qualitatively that a finding of no infringement is appropriate."  Gal v. Viacom Int'l, Inc., 403 F. Supp. 2d 294, 305 (S.D.N.Y. 2005) (quoting Rogers v. Koons, 960 F.2d 301, 308 (2d Cir. 1992)).  But "[b]ecause they involve literal copying, in cases of 'fragmented literal similarity,' more so than under the 'ordinary observer test,' the copying of even a 'relatively small' quantitative 'portion of the pre-existing work may be substantial if it is of great qualitative importance to the [pre-existing] work as a whole.'"  TufAmerica, 968 F. Supp. 2d at 597.

10

Under either test, only the protectable portions of the copyrighted works are compared for substantial similarity.  "To qualify for copyright protection, a work must be original to the author.  Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity." Feist, 499 U.S. at 345.  Where works "have both protectible and unprotectible elements [the] analysis must be more discerning and . . . [courts] must attempt to extract the unprotectible elements from . . . consideration and ask whether the protectible elements, standing alone, are substantially similar." Peter F. Gaito, 602 F.3d at 66 (internal quotation marks and citations omitted).

Cliché language is not subject to copyright protection.  See McDonald v. West, 138 F. Supp. 3d 448, 456 (S.D.N.Y. 2015) ("The phrase 'Made in America' is not copyrightable, either as a title, or as a lyric. It is far too brief, common, and unoriginal to create any exclusive right vested in Plaintiff.").  And "[o]rdinary historical facts and events are not protectable elements under the Copyright Act. . . .  [Only] 'thin' copyright protection . . . exist[s] for an original selection or arrangement of facts, 'but the copyright is limited to the particular selection or arrangement.'" Crane, 593 F. Supp. 2d at 590 (quoting Feist, 499 U.S. at 349–51).

Although Pound Cake copies much of JSR verbatim, Defendants contend that the sampled portion removes much of the factual account, is primarily cliché that is not entitled to protection, and only "goes to trivial . . . elements of the original work." TufAmerica, 968 F. Supp 2d at 598; Newton v. Diamond, 388 F.3d 1189, 1195 (9th Cir. 2004) ("Because the degree of similarity is high in such cases, the dispositive question is whether the copying goes to trivial or substantial elements.").

But courts must not "dissect the works at issue into separate components and compare only the copyrightable elements." Boisson v. Banian, Ltd, 273 F.3d 262, 272 (2d Cir. 2001). Instead, courts should "examine the works for their total concept and feel." Yurman Design, Inc. v. PAJ, Inc., 262 F.3d 101, 111 (2d Cir. 2001) (internal quotation marks omitted). And while "[an] 'ordinary' phrase may enjoy no protection as such . . . its use in a sequence of expressive words does not cause the entire passage to lose protection." Salinger v. Random House, Inc., 811 F.2d 90, 98 (2d Cir. 1987), opinion supplemented on denial of reh'g, 818 F.2d 252 (2d Cir. 1987). Thus, creative expression employing the use of clichéd words may still be protectable.

In the end, "[i]t would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [art], outside of the narrowest and most obvious limits." Bleistein v. Donaldson Lithographing Co., 188 U.S. 239, 251 (1903) (Holmes, J.). Ultimately, a determination of whether the copied portions of JSR are entitled to copyright protection depends on a subjective assessment better suited for a jury than a court. Accordingly, summary judgment on the elements of infringement is not appropriate here.

II.     FAIR USE

Alternatively, Defendants argue that Plaintiffs' claims are barred by the fair use doctrine. Fair use is an affirmative defense to copyright infringement, Campbell v. Acuff-Rose Music, Inc., 510 U.S. 569, 590 (1994), and thus the party asserting fair use bears the burden of proof. Am. Geophysical Union v. Texaco Inc., 60 F.3d 913, 918 (2d Cir. 1994).

The doctrine of fair use has its roots in the "ultimate goal" of copyright law—that is, "to expand public knowledge and understanding, [a goal] which copyright seeks to achieve by giving potential creators exclusive control over copying of their works, thus giving them a financial incentive to create informative, intellectually enriching works for public consumption."

Authors Guild v. Google, Inc., 804 F.3d 202, 212 (2d Cir. 2015).  Implied in this objective is the

principle that "while authors are undoubtedly important intended beneficiaries of copyright, the

ultimate, primary intended beneficiary is the public, whose access to knowledge copyright seeks

to advance by providing rewards for authorship."  Authors Guild, 804 F.3d at 212.  Accordingly,

courts developed the fair use doctrine to preclude a finding of infringement where "the copyright

law's goal of 'promoting the Progress of Science and useful Arts' . . . would be better served by

allowing the use than by preventing it."  Castle Rock, 150 F.3d at 141.

        Congress codified the fair use doctrine in the Copyright Act of 1976.  Section 107

of the Act provides that:

> Notwithstanding the provisions of sections 106 and 106A, the fair use of a copyrighted
> work . . . for purposes such as criticism, comment, news reporting, teaching . . . ,
> scholarship, or research is not an infringement of copyright.  In determining whether the
> use made of a work in any particular case is a fair use the factors to be considered shall
> include—
>
> (1) The purpose and character of the use, including whether such use is of a commercial
> nature or is for nonprofit educational purposes;
> (2) The nature of the copyrighted work;
> (3) The amount and substantiality of the portion used in relation to the copyrighted work
> as a whole; and
> (4) The effect of the use upon the potential market for or value of the copyrighted work.

Because the fair use determination is "an open-ended and context-sensitive inquiry," the

examples and factors in the statute are "illustrative and not limitative . . . [and] provide only

general guidance about the sorts of copying that courts and Congress most commonly had found

to be fair uses."  Cariou v. Prince, 714 F.3d 694, 705 (2d Cir. 2013) (quoting Campbell, 510 U.S.

at 577–78)).  Ultimately, fair use analysis asks a simple question: Is this the type of use that

furthers the essential goal of copyright law and should be excused from liability for

infringement?

Because copyright infringement involves highly fact-dependent analysis, courts "should be especially wary of granting summary judgment." Leibovitz v. Paramount Pictures Corp., 948 F. Supp. 1214, 1217 (S.D.N.Y. 1996). "This is especially true in fair use cases, as the viability of the defense rests on the particular circumstances of each case and the balancing of various factual considerations." Abilene Music, Inc. v. Sony Music Entmt., Inc., 320 F. Supp. 2d 84, 88 (S.D.N.Y. 2003). When "the likelihood that additional, non-cumulative evidence will be presented at trial is slight," however, summary judgment may be appropriate. Abilene Music, 320 F. Supp. 2d at 88. Indeed, "[a]lthough fair use is a mixed question of law and fact, courts in the Second Circuit have 'on a number of occasions' resolved fair use determinations at the summary judgment stage where there are no genuine issues of material fact." North Jersey Media Grp. Inc. v. Pirro, 74 F. Supp. 3d 605, 614 (S.D.N.Y. 2015).

### a. Factor #1: Purpose and Character of the Use

The first statutory factor, which courts have referred to as "[t]he heart of the fair use inquiry," focuses on the nature and purposes of the allegedly infringing use. Davis v. The Gap, Inc., 246 F.3d 152, 174 (2d Cir. 2001). The central question is "whether and to what extent the new work is 'transformative.'" Campbell, 510 U.S. at 579. This is a critical issue because "[t]he more the appropriator is using the copied material for new, transformative purposes, the more it serves copyright's goal of enriching public knowledge and the less likely it is that the appropriation will serve as a substitute for the original or its plausible derivatives." Authors Guild, 804 F.3d at 214. Accordingly, the relevant inquiry on this factor is whether the new work "merely supersedes the objects of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." Campbell, 510 U.S. at 579.

Defendants advance three arguments for the transformative nature of their use of JSR.  First, Defendants claim that Pound Cake fundamentally alters the message of the original work—that is, by editing the recording from "Jazz is the only real music that's gonna last" to "Only real music is gonna last," Drake transformed Jimmy Smith's dismissive comment into a statement on the relevance and staying power of "real music," regardless of genre.  Second, Defendants note that Pound Cake omits all references to the recording of *Off the Top*, thereby making the words applicable to the process of making Drake's album rather than Jimmy Smith's.  Finally, Defendants claim that the addition of background music, the rearrangement of some words, and the placement of the recording in a seven-minute hip hop track renders their use transformative.

Defendants' second and third arguments are misplaced because they conflate the nature of a fair use with that of a derivative work.  The word "transform" appears in the statutory definition of derivative works, which of course require a license and are not protected by the fair use doctrine.  17 U.S.C. § 101.  Although derivative works typically involve transformative changes, "[t]he statutory definition suggests that derivative works generally involve transformations in the nature of <u>changes of form</u>."  <u>Authors Guild</u>, 804 F.3d at 215.  Thus, when a new work transforms a copyrighted work but uses it for "the same [] purpose for which the [original] is sold," the new work is a derivative work rather than fair use.  <u>Ringgold v. Black Etmt. Television, Inc.</u> 126 F.3d 70, 79 (2d Cir. 1997) (finding no transformative use where defendant's use of a copyrighted design as a set decoration had the same purpose—decorative display—as plaintiff's product bearing that design); <u>see also</u> <u>Davis</u>, 246 F.3d at 174 (defendant's use in an advertisement of plaintiff's product "being worn as eye jewelry in the manner it was made to be worn" was not transformative").  Drake's use of JSR to describe his own recording

process, although literally transformative in the sense that he does not appropriate JSR verbatim, would bear the same purpose that Jimmy Smith had when he first recorded JSR. Accordingly, these arguments cannot support a fair use defense.

Defendants' first argument, on the other hand, strikes on a compelling reason to find this use transformative. There can be no reasonable dispute that the key phrase of JSR— "Jazz is the only real music that's gonna last. All that other bullshit is here today and gone tomorrow. But jazz was, is and always will be."—is an unequivocal statement on the primacy of jazz over all other forms of popular music. Defendants' use of JSR, by contrast, transforms Jimmy Smith's brazen dismissal of all non-jazz music into a statement that "real music," with no qualifiers, is "the only thing that's gonna last." Thus, Defendants' "purposes in using [the original work] are sharply different from [the original artist's] goals in creating it." Blanch v. Koons, 467 F.3d 244, 252 (2d Cir. 2006). This is precisely the type of use that "adds something new, with a further purpose or different character, altering the first [work] with new expression, meaning, or message." Campbell, 510 U.S. at 579.

Plaintiffs contend that the use cannot be transformative because the copied portions are not readily identifiable as JSR and because the track does not identify Jimmy Smith. Thus, Plaintiffs argue, there can be no viable claim that Pound Cake is commenting on an obscure spoken-word track by a relatively unknown jazz musician (at least outside of the jazz community). This argument fails because Plaintiffs seek to apply the standard for fair use in parody to this non-parodic use. Although it is certainly true that the object of a parody must be ascertainable to the average observer—and with reason, for what good is parody if the listener cannot identify the target of derision?—this is not a universal prerequisite for finding a transformative use. For example, the court in Blanch v. Koons found that the defendant's

appropriation of a small part of a magazine advertisement (specifically, a picture of a woman's legs and feet) into a larger mixed-media artwork was a transformative use even though no reasonable observer would identify the legs as being from the original advertisement.  467 F.3d 244, 252 (2d Cir. 2006).  Because the defendant used the copyrighted work as "raw material . . . in furtherance of distinct creative or communicative objectives," the <u>Blanch</u> court found that the use was a transformative one.  467 F.3d at 253.

Similarly, Defendants' use of JSR is transformative regardless of whether the average listener would identify the source of the sample and immediately comprehend Drake's purposes.  The critical question is "how the work <u>in question</u> appears to the reasonable observer," not the quality or accessibility of the commentary.  <u>Cariou</u>, 714 F.3d at 707 (emphasis added).  The average listener of Pound Cake would understand the sampled portions of JSR as a statement that, regardless of how a song was made or how one might classify it, "only <u>real</u> music is gonna last."  Because this purpose is "sharply different" from Jimmy Smith's purpose in creating the original track, Defendants' use is transformative and this factor weighs in favor of a finding of fair use.  <u>Blanch</u>, 467 F.3d at 252.

### b.   Factor #2: Nature of the Copyrighted Work

The second statutory factor "calls for recognition that some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied."  <u>Campbell</u>, 510 U.S. at 586.  "Two types of distinctions as to the nature of the copyrighted work have emerged that have figured in the decisions evaluating the second factor: (1) whether the work is expressive or creative, such as a work of fiction, or more factual, with greater leeway being allowed to a claim of fair use where the work is factual or informational, and (2) whether the work is published or unpublished, with

17

the scope for fair use involving unpublished works being considerably narrower." 2 Howard B.

Abrams, THE LAW OF COPYRIGHT, § 15:52 (2006).  As the Second Circuit has noted, this factor

"is rarely found to be determinative." Davis, 246 F.3d at 175.

Because JSR is a work of creative expression, this factor weighs against a finding

of fair use.  Defendants' contention that JSR is only entitled to "thin" copyright because it is

merely a factual account of the recording of *Off the Top* ignores the Supreme Court's instruction

that facts "clothe[d] . . . with an original collocation of words" are still entitled to copyright

protection. Feist, 499 U.S. at 348 ("Others may copy the underlying facts from the publication,

but not the precise words used to present them.").  This factor is of particularly "limited

usefulness" in this case, however, because this Court has already determined that "the creative

work of art is being used for a transformative purpose." Bill Graham Archives v. Dorling

Kindersley Ltd., 448 F.3d 605, 612 (2d Cir. 2006).

### c.   Factor #3: Amount and Substantiality of the Portion Used

The next factor asks the court to consider "the amount and substantiality of the

portion used in relation to the copyrighted work as a whole."  17 U.S.C. § 107(3).  The "clear

implication" of this inquiry "is that a finding of fair use is more likely when small amounts, or

less important passages, are copied than when the copying is more extensive, or encompasses the

most important parts of the original." Authors Guild, 804 F.3d at 221.  Thus, the test is "whether

the quantity and value of the materials used[] are reasonable in relation to the purpose of the

copying." Blanch, 467 F.3d at 257.

Plaintiffs contend that Defendants appropriated an unreasonable portion of JSR

when they used thirty-five seconds of the one-minute track, and that any statement on the staying

power of "real" music would necessitate the use of only that single line.  The law "does not

18

require," however, "that the secondary artist . . . take no more than is necessary," Cariou, 714

F.3d at 710, and instead permits the secondary user "to 'conjure up' at least enough of the

original" to accomplish his transformative purpose.  Campbell, 510 U.S. at 588 (emphasis

added).

      Here, the Court finds the amount taken by Defendants to be reasonable in

proportion to the needs of the intended transformative use.  Far from being extraneous to Pound

Cake's statement on the importance of "real" music, Defendants' use of the lines describing the

recording of *Off the Top* serve to drive the point home.  The full extent of the commentary is, in

this Court's view, that many musicians make records in similar ways (e.g. with the help of A&R

experts or the stimulating effects of champagne), but that only "real" music—regardless of

creative process or genre—will stand the test of time.  Accordingly, this factor favors a finding

of fair use.

### d.  Factor #4: Effect on the Market for the Copyrighted Work

      On the final factor, courts analyze "the effect of the [secondary] use upon the

potential market for or value of the copyrighted work."  17 U.S.C. § 107(4).  As the ability to

reap financial rewards from creative endeavors is a critical component of the copyright regime,

the Supreme Court has noted that this factor is "undoubtedly the single most important element

of fair use."  Harper & Row Publishers, Inc. v. Nation Enter., 471 U.S. 539, 566 (1985).  At this

stage, courts ask "whether the copy brings to the marketplace a competing substitute for the

original, or its derivative, so as to deprive the rights holder of significant revenues because of the

likelihood that potential purchasers may opt to acquire the copy in preference to the original."

Authors Guild, 804 F.3d at 223; Cariou, 714 F.3d at 708–09 (noting that "the concern is not

whether the secondary use suppresses or even destroys the market for the original work or its

potential derivatives, but whether the secondary use <u>usurps</u> the market of the original work"). The fourth factor is also, however, closely linked to the first, in the sense that "the more the copying is done to achieve a purpose that differs from the purpose of the original, the less likely it is that the copy will serve as a satisfactory substitute for the original." <u>Authors Guild</u>, 804 F.3d at 223; <u>Castle Rock</u>, 150 F.3d at 145 ("The more transformative the secondary use, the less likelihood that the secondary use substitutes for the original.").

   There is no evidence in the record to suggest that Pound Cake usurps any potential market for JSR or its derivatives.  JSR, a spoken-word criticism of non-jazz music at the end of an improvisational jazz album, targets a sharply different primary market than Pound Cake, a hip-hop track.  Further, Plaintiffs never attempted to establish a market for licensed derivative uses of the JSR composition copyright until Defendants used the recording on the Album.  <u>See</u> <u>Campbell</u>, 510 U.S. at 592 ("The market for potential derivative uses includes only those that the creators of original works would in general develop or license others to develop."). These considerations, coupled with the finding that Defendants' use is highly transformative, forestalls the conclusion that Defendants took such "sufficiently significant portions of the original as to make available a significantly competing substitute." <u>Authors Guild</u>, 804 F.3d at 223.  Thus, the fourth factor favors the Defendants.

   Having considered the four factors in light of the goals of copyright law and the facts in the record, this Court concludes that Defendants' inclusion of the copied portions of JSR in the recording of Pound Cake is a fair use and does not infringe Plaintiffs' composition copyright.

CONCLUSION

Because there is a genuine dispute of material fact as to ownership and copying, neither party is entitled to summary judgment on Plaintiffs' infringement claims.  For the reasons discussed above, however, this Court finds that any liability for Defendants' appropriation of JSR is barred by the doctrine of fair use.  Accordingly, Plaintiffs' motion for summary judgment is denied and Defendants' motion for summary judgment is granted.  The Clerk of Court is directed to terminate the motions pending at ECF Nos. 91 and 97 and mark this case as closed.

Dated: May 30, 2017
      New York, New York

SO ORDERED:

_____
WILLIAM H. PAULEY III
U.S.D.J.

21